Slip Op. 18-2

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HYUNDAI STEEL CO.,<br><br>     Plaintiff,<br><br>  v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br>AK STEEL CORP., ARCELORMITTAL USA LLC, CALIFORNIA STEEL INDUS., INC., NUCOR CORP., STEEL DYNAMICS, INC., and UNITED STATES STEEL CORP.<br><br>     Defendant-Intervenors. | **Before: Jane A. Restani, Judge**<br><br>**Court No. 16-00161**<br><br>**PUBLIC VERSION** |

## OPINION

[Commerce's final results in antidumping duty investigation of CORE from Korea remanded.]

Dated: January 10, 2018

  J. David Park, Arnold & Porter Kaye Scholer LLP, of Washington, DC, argued for plaintiffs. With him on the brief were Andrew Treaster, Daniel Wilson, Henry Almond, and Sylvia Yun Chu Chen.

  Elizabeth Speck, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. Of counsel on the brief was James Ahrens II, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

  Grace Kim, Joshua Morey, Kathleen Cannon, Paul Rosenthal, and R. Alan Luberda, Kelley Drye & Warren, LLP, of Washington, DC, for defendant-intervenor ArcelorMittal USA LLC.

Roger Schagrin, Christopher Cloutier, John Bohn, and Paul Jameson, Schagrin
Associates, of Washington, DC, for defendant-intervenors Steel Dynamics, Inc. and California
Steel Industries, Inc.

Stephen Jones, and Daniel Schneiderman, King & Spalding, LLP, of Washington, DC,
for defendant-intervenor AK Steel Corporation.

Luke Meisner, Skadden Arps Slate Meagher & Flom, LLP, of Washington, DC, argued
for defendant-intervenor United States Steel Corporation.  With him on the brief was Jeffrey
Gerrish.

Alan Price, Adam Teslik, Christopher Weld, Cynthia Galvez, Derick Holt, Laura El-
Sabaawi, Maureen Thorson, Stephanie Bell, Tessa Capeloto, Timothy Brightbill, and Usha
Neelakantan, Wiley Rein, LLP, of Washington, DC, for defendant-intervenor Nucor
Corporation.

**Restani, Judge:** In this action challenging a United States Department of Commerce

("Commerce") Antidumping Duty Investigation Determination regarding Corrosion-Resistant

Steel Products ("CORE") from Korea, Hyundai Steel Co. ("Hyundai") requests that the court

hold the final determination unsupported by substantial record evidence and otherwise not in

accordance with the law.  Hyundai accordingly requests that Commerce's determination be

remanded for correction of error.

## BACKGROUND

Based on petitions filed by defendant-intervenors, various domestic steel producers, on

June 30, 2015, Commerce initiated an investigation concerning the possible sale of CORE from

various countries at less than fair value ("LTFV").  Certain Corrosion-Resistant Steel Products

From Italy, India, the People's Republic of China, the Republic of Korea, and Taiwan:  Initiation

of Less-Than-Fair-Value Investigations, 80 Fed. Reg. 37,228, 37,228 (Dep't Commerce June 30,

2015).  Hyundai, a Korean CORE producer and exporter, was selected on July 23, 2015, as one

of two mandatory Korean respondents in this investigation.  Hyundai accounted for one of the

two largest volumes of Korean CORE exports, per U.S. Customs and Border Protection ("CBP")

entry data for the period of investigation.   Respondent Selection for the Antidumping Duty

Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea, A-580-

878, POI 04/01/2014–03/30/2015, at 8 (July 23, 2015).   This action concerns Commerce's

treatment, for computation of the United States sale price,[1] of Hyundai's further manufactured

products, other than completed automobiles, including skelp, sheets or blanks ("SSBs"), tailor-

welded blanks ("TWBs"), and after-market auto parts.[2]   To manufacture the latter two product

categories, Hyundai first sold CORE to its U.S. subsidiary, Hyundai Steel America, Inc.

("HSA"), in coil form.   HSA then sold the imported CORE:  (1) in unaltered form; (2) in slightly

further manufactured form, e.g., as SSBs; or (3) as TWBs.   HSA sold the foregoing products to

both affiliated and unaffiliated vendors that performed additional further processing before

selling the ultimate product to an affiliated automobile manufacturer.   Hyundai Steel Section A

Questionnaire Response, A-580-878, POI 04/01/2014–03/31/2015, at 2–3 (Sept. 4, 2015).   In

almost every case, the CORE sold through HSA is ultimately consumed in the production of

---

[1] In determining whether the subject merchandise is being sold at "less than fair value," a "fair comparison shall be made between the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a) (2015).  Normal value is defined as "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(B)(i).

[2] SSBs are products created by splitting, shearing, or stamping CORE coils.  See Hyundai Steel's Section E and Additional Sales Data Response, A-580-878, POI 04/01/2014–03/31/2015, at Ex. E-2 (Nov. 2, 2015).  Skelp is produced by splitting coil, sheet is produced by shearing skelp or coil, and blanks are produced by stamping (or pressing) skelp or coil.  Id.  TWBs are produced by welding sheet or blanks in a butt joint configuration.  Id.; Issues and Decision Memorandum for the Final Affirmative Determination in the Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea, A-580-878, POI 04/01/2014–03/31/2015, at 7 n. 9 (Dep't Commerce, May 24, 2016) ("Final Det. I&D Memo") (Hyundai uses TWBs in automobile doors).  [[

  ]]

automobiles by Hyundai affiliates.   <u>Notice of Difficulty in Responding to Questionnaire and</u>

<u>Request for Alternate Calculation Method</u>, A-580-878, POI 04/01/2014–03/31/2015, at 3 (Aug.

17, 2015) ("Notice of Difficulty").

Early in the investigation, Hyundai unsuccessfully requested Commerce to apply the

"special rule"[3] in valuing Hyundai's sales of further manufactured products for the purpose of

calculating Constructed Export Price.[4]   Instead, Commerce determined that Hyundai must

submit a "Section E" response with cost and sales data for such products.  Commerce published

---

[3] In an ordinary case, the constructed export price ("CEP") is the: "price at which the subject
merchandise is first sold (or agreed to be sold) in the United States . . . by or for the account of
the producer or exporter of such merchandise or by a seller affiliated with the producer or
exporter, to a purchaser not affiliated with the producer or exporter." 19 U.S.C. § 1677a(b)
(1994).
    The "special rule" applies where Commerce is seeking to determine the CEP of products
imported by the exporter or producer's affiliate and with value added to the imported product in
the United States.  <u>See</u> 19 U.S.C. § 1677a(e).  If the value added by the affiliate "is likely to
exceed substantially" the value of the product upon importation, then Commerce "shall
determine" the CEP by using either (1) "[t]he price of identical [products] sold by the exporter or
producer to an unaffiliated person," or (2) "[t]he price of other [products] sold by the exporter or
producer to an unaffiliated person." 19 U.S.C. § 1677a(e)(1)–(2).  The rule requires a "sufficient
quantity of sales to provide a reasonable basis for comparison" and that Commerce determines
that the use of such sales is appropriate. 19 U.S.C. § 1677a(e).
    Under the "special rule," therefore, Commerce would not use the actual sales price of the
specific sales.  Instead, Commerce would substitute prices from sales of "identical" or "other"
merchandise.  For example, where an importer sold a total of 90 identical units of CORE, 50 of
which <u>did not</u> qualify for the special rule and 40 of which <u>did</u> qualify for the special rule, if
Commerce were to apply the special rule to the latter units, the CEP applicable to all 90 units
would be the average sales price of the first 50 units. Whether this price would be higher or
lower than it would be without the "special rule" would depend upon the specific product, but it
nevertheless saves the respondent a significant reporting burden while easing Commerce's
administrative burden.

[4] Commerce did apply the "special rule" "when the first sale of corrosion-resistant steel to an
unaffiliated party [wa]s a completed automobile" produced by Hyundai Motor Manufacturing
Group ("HMMG") or Kia Motor Manufacturing Group ("KMMG").  <u>Decision Memorandum for</u>
<u>the Preliminary Determination in the Antidumping Duty Investigation of Certain Corrosion-</u>
<u>Resistant Steel Products from the Republic of Korea</u>, A-580-878, POR: 04/01/2014–03/31/2015,
at 11 n.35 (Dec. 21, 2015) ("Prelim. Det. I&D Memo").  Hyundai does not argue here that its
sales of SSBs qualify for the "special rule."  Pl. Br. at 33–35.

its preliminary determination on January 4, 2016, with a preliminary antidumping duty of 3.51

percent for Hyundai.  Certain Corrosion-Resistant Steel Products From the Republic of Korea:

Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of

Final Determination, 81 Fed. Reg. 78, 79 (Dep't Commerce Jan. 4, 2016) ("Preliminary

Determination").[5]  Between January and March of 2016, Commerce conducted verifications of

Hyundai's reported home market sales, U.S. sales, and cost of production data.  Over Hyundai's

objections, however, Commerce, finding Hyundai's submissions deficient, declined to verify

data associated with Hyundai's affiliates' U.S. manufacturing operations, or the sales associated

with such products.  Cancellation of Hyundai Steel Company's Constructed Export Price (CEP)

Verification of Further Manufactured Sales, A-580-878, POI 04/01/2014–03/31/2015, at 1–2

(Dep't Commerce, Mar. 8, 2016) ("Verification Cancellation Letter").

After having issued three supplemental questionnaires regarding Hyundai's further

manufactured product cost and sales data in November 2015, December 2015, and February

2016, Commerce ultimately issued a final determination and order which applied an adverse

inference to the facts available ("AFA") in calculating a final dumping margin of 47.8 percent

for Hyundai.  Final Determination of Sales at Less Than Fair Value and Final Affirmative

Determination of Critical Circumstances, 81 Fed. Reg. 35,303, 35,304 (Dep't Commerce June 2,

2016) ("Final Determination"); as amended by Certain Corrosion-Resistant Steel Products From

India, Italy, the People's Republic of China, the Republic of Korea and Taiwan:  Amended Final

Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders,

81 Fed. Reg. 48,390, 48,393 (Dep't Commerce July 25, 2016) ("Antidumping Duty Order").  In

---

[5] Hereafter, citations to the titles of documents related to Commerce's investigation of Korean
CORE will omit the portion of the title which precedes the colon.

the memorandum appended to its Final Determination, Commerce noted myriad problems with

Hyundai's responses to Commerce's information requests.  <u>Issues and Decision Memorandum

for the Final Affirmative Determination in the Antidumping Duty Investigation of Certain

Corrosion-Resistant Steel Products from the Republic of Korea</u>, A-580-878, POI 04/01/2014–

03/31/2015, at 7–14, 31–33 (Dep't Commerce May 24, 2016) ("Final Det. I&D Memo").

Hyundai timely filed a summons to commence this action on August 23, 2016, and filed a

complaint on September 6, 2016.  Docket Nos. 1, 7.  <u>See</u> 19 U.S.C. § 1516a(a)(2)(A) (2006); 28

U.S.C. § 2636(c) (1993).  Hyundai moved for judgment on the agency record on March 20,

2016.  Docket No. 51.  This opinion follows briefing and oral argument by the parties and certain

defendant-intervenors.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2016).  Commerce's final

results in an administrative review of an antidumping duty order are upheld unless they are

"unsupported by substantial evidence on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

Hyundai alleges Commerce's Final Determination is deficient in two respects.  First, it

argues Commerce unreasonably failed to apply the "special rule" applicable to merchandise with

value added after importation to Hyundai's TWBs and auto parts.  Second, Hyundai argues

Commerce erred in applying AFA with respect to Hyundai's further manufactured TWBs, auto

parts, and SSBs.

**I.   Commerce's decision not to apply the "special rule" applicable to merchandise with value added after importation was reasonable.**

Hyundai first argues Commerce unreasonably declined to apply the "special rule" applicable to merchandise with value added after importation to its TWBs and auto parts.  Pl. Br. at 33–41.  Under 19 U.S.C. § 1677a(e) (1994), where the value added to an imported product in the United States "is likely to exceed substantially" the value of the product upon importation, Commerce "shall determine the constructed export price" using the price of either identical or other subject merchandise sold by the producer to an unaffiliated entity.   Under the applicable regulations, a substantial excess in value requires an "estimate[d]" excess of "at least 65 percent of the price charged to the first unaffiliated purchaser . . . in the United States." 19 C.F.R. § 351.402(c)(2) (2013).   Though Commerce "normally will determine" the prerequisite satisfied in such circumstances, <u>id.</u>, even where this threshold is met, application of the "special rule" is left to Commerce's reasonable exercise of discretion.  <u>RHP Bearings LTD v. United States</u>, 288 F.3d 1334, 1344–46 (Fed. Cir. 2002).

On August 15, 2015, Hyundai submitted a letter requesting that Commerce apply the "special rule" to its further manufactured products sold to unaffiliated purchasers in the United States.  Notice of Difficulty at 2.   In response, regarding Hyundai's sales of TWBs and auto parts, Commerce requested that Hyundai "provide a calculation of the percentage of the value added to the imported merchandise under consideration after importation and prior to sale to the unaffiliated vendor." <u>Additional Guidance on information required to substantiate Hyundai Steel Corporation's Request for Alternative Calculation Method</u>, A-580-878, POI 04/01/2014–03/31/2015, at Attach. 1 (Dep't Commerce Sept. 16, 2015).   No specific guidance was provided concerning how to account for the value added to further manufactured products incorporating multiple subject imports.  <u>See</u> <u>id.</u> Commerce cannot, however, be expected to provide specific

instructions regarding aspects of a respondent's manufacturing process of which it is unaware.

There is no indication in the record that, at the outset, Commerce was aware of this particular

reporting issue.[6]

Nine days later, Hyundai responded with information on its sales of TWBs and auto

parts.  Response to the Department's Request for Additional Information, A-580-878, POI

04/01/2014–03/31/2015, at Ex.4 (Sept. 25, 2015) ("September 25 Response").  In a letter dated

October 15, 2015, Commerce determined, without explanation, that Hyundai failed to

demonstrate that the value added in the United States "is equal to or greater than 65 percent of

the imported coil with respect to Hyundai's further manufactured sales of certain auto parts [and

TWBs]," and accordingly declined to apply the "special rule."  Hyundai Steel Company's

Exclusion Request, A-580-878, POI 04/01/2014–03/31/2015, at 1 (Dep't Commerce Oct. 15,

2015) ("Section E Request").

Here, Hyundai first argues that Commerce failed to describe its preferred method for

evaluating value added, in violation of the Uruguay Round Agreements Act Statement of

Administrative Action ("SAA").  The SAA indicates "Commerce will provide" interested parties

with a description of the method chosen to evaluate value added.  Uruguay Round Agreements

Act, Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 825–26 (1994),

---

[6] Although Hyundai alleges otherwise, Pl. Br. at 21, the record of an earlier ex-parte meeting involving Commerce and Hyundai does not mention any particular issue.  Ex Parte Meeting with Hyundai Steel Company, A-580-878, POI 04/01/2014–03/31/2015, at 1 (Dep't Commerce Aug. 21, 2015).  The Notice of Difficulty which preceded this meeting referenced only reporting issues regarding a possible Section E submission.  Notice of Difficulty at 9–14.

reprinted in 1994 U.S.C.C.A.N. 4040, 4165 ("SAA").[7]   Defendant-intervenors contend that by

not mandating a "precise calculation," the SAA does not require Commerce to provide a detailed

explanation supporting its decision to apply the "special rule."  Def.-Int. Br. at 16.

In relevant part, the SAA provides:

> [F]or purposes of estimating whether the value added in the United States is likely
> to substantially exceed the value of the imported product, it is the
> Administration's intent that Commerce not be required to perform a precise
> calculation of the value added.  Requiring such a precise calculation would defeat
> the purpose of the new rule of saving Commerce the considerable effort of
> measuring precisely the U.S. value added.  Commerce will provide interested
> parties, normally as part of the preliminary determination, with a description of
> the method chosen and an explanation regarding the selection of such method.

SAA at 826.  Defendant-intervenors' interpretation of this passage, which omits the last sentence

and focuses on the absence of a need for "precise calculation," is unavailing.   "[P]recise

calculation" is more logically juxtaposed with "estimation."   To give meaning to the entire

passage, including the last sentence, it is reasonably read as requiring that Commerce provide

some description of its method of estimating whether the value added in the United States is

likely to substantially exceed the value of the imported product.   This likewise serves the

purposes underlying the "special rule."  See Antidumping Duties; Countervailing Duties, 62 Fed.

Reg. 27,296, 27,353 (Dep't Commerce May 19, 1997) ("the purpose of section 772(e) is to

reduce the administrative burden on the Department").  Neither the "special rule" statute, nor its

---

[7]  The SAA is an "authoritative expression" when interpreting and applying the Uruguay Round
Agreements Act. 19 U.S.C. § 3512(d) (1994).   See also Micron Tech., Inc. v. U.S., 243 F.3d
1301, 1309 (Fed. Cir. 2001).

regulations,[8] nor the SAA, however, specify a particular method of calculation that could be applicable in all cases.

By clarifying the methods by which respondents' submissions will be evaluated, Commerce reduces its administrative burden by warding off inapposite submissions or avoiding the burden of having to recalculate the value added by itself.  Here, Commerce contends that the insufficiencies of Hyundai's calculations were adequately explained in Commerce's Final Determination.[9]  See Final Det. I&D Memo at 24–25.  See also Decision Memorandum for the Preliminary Determination in the Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea, A-580-878, POI 04/01/2014–03/31/2015, at 11 (Dep't Commerce Dec. 21, 2015) ("Prelim. Det. I&D Memo") (providing no further explanation for the insufficiencies of Hyundai's calculations).  Yet, upon reviewing Hyundai's September 25 Response, Commerce likely should have been aware of Hyundai's particular reporting complication, and yet it offered no detailed description of its preferred method of estimation before issuing its Final Determinations.  In this case, however, if there were a procedural misstep, it is of no moment.  Availability of the "special rule" is to be determined early on, in order to leave time for the main ordinary calculations, if necessary.  Its intended beneficiary is Commerce, thus, a respondent has the burden to demonstrate its eligibility.

---

[8] The applicable regulation states generally:  "The Secretary normally will estimate the value added based on the difference between the price charged to the first unaffiliated purchaser for the merchandise as sold in the United States and the price paid for the subject merchandise by the affiliated person."  19 C.F.R. § 351.402(c)(2).

[9] In its Final Determination, Commerce interpreted the "special rule" regulation as indicating that "the appropriate value added calculation for further manufacturing compares:  (i) the total value of the Hyundai-produced CORE used to produce the TWB (or auto part); and (ii) the price charged to the first unaffiliated purchaser for the TWB (or auto part)."  Final Det. I&D Memo at 24 (emphasis added).

Hyundai failed to satisfy the 65% value-added threshold necessary for application of the "special rule."

Hyundai's September 25 submission relied upon an unreasonable calculation method. This is not the first value-added case; in the absence of more specific instructions from Commerce, Hyundai could have adapted an analogous approach from a prior case to calculate the value added to its further manufactured products.  Hyundai does cite DRAMS from Korea as support for its approach.    Plaintiff Br. at 35, 38; Dynamic Random Access Memory Semiconductors of One Megabit or Above From the Republic of Korea; Preliminary Results of Antidumping Duty Administrative Review, 60 Fed. Reg. 47,149-03, 47,150 (Dep't Commerce Sept. 11, 1995) ("DRAMs from Korea").[10]  In DRAMS from Korea, a case involving imported DRAMS combined on a circuit board to manufacture memory modules after importation, Commerce applied the following approach:  "For DRAMs that were further manufactured into memory modules after importation, we deducted all value added in the United States, pursuant to

---

[10] Although Commerce rightly notes that the "special rule" statute was not in effect at the time DRAMs from Korea was decided, Def. Br. at 20, the "special rule" statute does not preclude recourse to methods of calculation which predated its adoption, to the extent that basic concepts such as further manufacturing remain the same.  Even though it was obvious in DRAMS from Korea that there were multiple DRAMS on each memory module sold in the United States, Hyundai asserts that Commerce permitted the total adjusted U.S. price for a memory module to be compared to the constructed foreign market value ("FMV") for a single DRAM. This was not Commerce's approach in DRAMS from Korea, and in any case it would be nonsensical to proceed in such a manner, before or after the special rule.  In DRAMS from Korea, Commerce found no foreign market sales of memory modules featuring the same configurations of DRAMS as the memory modules produced and sold in the U.S.  To construct the FMV, Commerce thus, inter alia, "summed the cost of production for each DRAM included on each type of module to obtain the cost of all the imported components included on the module."  DRAMS from Korea, 61 Fed. Reg. at 20,219.  The constructed FMV was then compared with the U.S. sales price for a memory module featuring identical DRAMS, minus, inter alia, the value added by U.S. further manufacturing.  Id.  It would thus defeat the purpose of this calculation, meant to compare identical groups of DRAMS, to subtract the value of one or more foreign-produced DRAMS as part of the value added by U.S. further manufacturing.

[§ 1677a(e)].  The value added consists of the costs of the materials, fabrication, and general expenses associated with the <u>portion of</u> the merchandise further manufactured in the United States, as well as a proportional amount of profit or loss attributable to the value added."

<u>DRAMS from Korea</u>, 60 Fed. Reg. at 47,150 (emphasis added); <u>see also</u> <u>Dynamic Random Access Memory Semiconductors of One Megabit or Above From the Republic of Korea; Final Results of Antidumping Duty Administrative Review</u>, 61 Fed. Reg. 20,216, 20,216 (Dep't Commerce May 6, 1996) (adopting the same calculation method).  In calculating the value added, <u>DRAMS from Korea</u> thus included additional materials associated with further manufacturing in the U.S., such as a circuit board, but excluded all imported subject materials, such as the DRAMS affixed to those circuit boards.  By contrast, Hyundai's calculation method, which counted the value of one subject import as part of the "value added" to a product made of two subject imports, is not supported by past practice and is unreasonable.  September 25 Response at Ex. 4.[11]

By failing to offer any reasonable calculation, whether or not it was one preferred by Commerce, Hyundai did not meet its burden; Hyundai was double-counting a credit.  After removing the value of the second CORE, based on the record, Hyundai's sales of TWBs and auto parts do not meet the 65-percent threshold.[12]  Final Det. I&D Memo at 24–25.  Hyundai contends that its November and December data would permit a favorable recalculation, but as

---

[11] Moreover, this was indicated to Hyundai in defendant-intervenors' comments on its September 25, 2015, submission.  <u>U.S. Steel Comments</u>, A-580-878, POI 04/01/2014–03/31/2015, at 2–6 (Oct. 2, 2015).

[12] This conclusion is also supported by a study commissioned by Defendant-Intervenors for purposes of their August 20, 2015, comments on Hyundai's August 15, 2015, letter.  Def.-Int. Br. at 17; <u>U.S. Steel Comments Regarding Hyundai's August 17, 2015 Notice of Difficulty</u>, A-580-878, POI 04/01/2014–03/31/2015, at Ex. 2 (Aug. 20, 2015).

described in Part II of this opinion, that data was untimely.  As Hyundai failed to satisfy the

prerequisites of 19 C.F.R. § 351.402(c)(2), Commerce's decision not to apply the "special rule"

to Hyundai's sales of TWBs and auto parts was not unreasonable or arbitrary and represented a

proper exercise of its discretion.[13]  The court now turns to calculations under normal methods.

## II. Commerce's application of AFA was reasonable as to Hyundai's sales of TWBs and auto parts, but unreasonable as to Hyundai's sales of SSBs.

Hyundai next challenges Commerce's adverse application of facts otherwise available in

determining the dumping margin for sales of SSBs, TWBs, and auto parts.

A respondent in an antidumping investigation is obligated to prepare an "accurate and

complete record in response to questions plainly asked by Commerce." Tung Mung Dev. Co. v.

United States, 25 C.I.T. 752, 789 (2001) (citing Olympic Adhesives, Inc. v. United States, 899

---

[13] Hyundai's argument that the complexities associated with reporting on its further manufactured products justify Commerce's application of the "special rule" likewise fail. Section 1677a(e) does not require application of the "special rule" based on complexity alone. Although Commerce has applied the "special rule" in past cases where respondent encountered reporting difficulties, all cases cited by Hyundai are distinguishable.  In HRS from the Netherlands, respondent had already satisfied the 65-percent threshold. Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Certain Hot-Rolled Steel Flat Products from the Netherlands, A-421-813, POI 07/01/2014–06/31/2015, at 11–12 (Dep't Commerce Mar. 14, 2016), unchanged in Certain Hot-Rolled Steel Flat Products From the Netherlands: Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances, 81 Fed. Reg. 53,421 (Dep't Commerce Aug. 12, 2016). In CRS from Korea, Commerce applied the "special rule" because it was able to verify respondent's reporting with respect to the further manufactured products in question. Issues and Decision Memorandum for the Final Affirmative Determination in the Antidumping Duty Investigation of Certain Cold-Rolled Steel Products from the Republic of Korea, A-580-881, POI 07/01/2014–06/30/2015, at 65–66 (Dep't Commerce July 20, 2016).  In PET Film from Thailand, the manufacturer bought film from many producers, including respondent, whereas HSA only purchased CORE from Hyundai.  Use of Hyundai's CORE was, at least in theory, thus significantly easier to track.  Notice of Preliminary Determination of Sales at Not Less Than Fair Value: Polyethylene Terephthalate Film, Sheet, and Strip from Thailand, 73 Fed. Reg. 24,565, 24,568–69 (Dep't Commerce May 5, 2008), unchanged in Notice of Final Determination of Sales at Less Than Fair Value: Polyethylene Terephthalate Film, Sheet, and Strip from Thailand, 73 Fed. Reg. 55,043 (Dep't Commerce Sept. 24, 2008).

F.2d 1565, 1571 (Fed. Cir. 1990)).  Commerce is authorized by 19 U.S.C. § 1677e(a) to make a determination on the basis of "facts otherwise available" where, inter alia:  (1) necessary information is not available in the record; or (2) an interested party (a) withholds requested information; (b) fails to timely provide information in the form requested; (c) significantly impedes proceedings; or (d) provides information which cannot be verified under 19 U.S.C. § 1677m(i).  See, e.g., Ningbo Dafa Chem. Fiber Co. v. United States, 580 F.3d 1247, 1251 (Fed. Cir. 2009).  In this case, Commerce alleges that recourse to facts otherwise available was proper because certain information was not reasonably available in the record, § 1677e(a)(1), Hyundai's December 29 database submissions were untimely, § 1677e(a)(2)(b), and Hyundai significantly impeded the proceeding through delays and the provision of unusable information, § 1677e(a)(2)(c).  See Prelim. Det. I&D Memo. at 12; Final Det. I&D Memo at 13; Def. Br. at 24.

All scenarios described in § 1677e(a) are subject to the requirement that Commerce, upon determining that a respondent has submitted non-compliant information, promptly inform that respondent of the nature of the deficiency and, to the extent practicable in view of statutory investigation time-limits, provide an opportunity to remedy or explain the deficiency.  19 U.S.C. § 1677e(a) (2015), 1677m(d) (2015).  If respondent is unable to timely remedy the deficiency, Commerce may, subject to 19 U.S.C. § 1677m(e), disregard "all or part of the original and subsequent responses."  19 U.S.C. § 1677m(d); SAA at 865.

Section 1677m(e) precludes Commerce from ignoring information, even if it doesn't satisfy all requirements established by Commerce, where the interested party can demonstrate: (1) it "acted to the best of its ability" in supplying compliant information; and (2) the information (a) is timely submitted, (b) is verifiable, (c) is not so incomplete that it cannot furnish a reliable

basis for making the determination, and (d) can be used without undue difficulties.  19 U.S.C.

§ 1677m(e).  If these criteria are not satisfied, Commerce is not statutorily obligated to allow

respondent to remedy its submission.  See Papierfabrik Aug. Koehler SE v. United States, 843

F.3d 1373, 1382 (Fed. Cir. 2016), cert. denied, 2017 WL 3324989 (U.S. Dec. 11, 2017) (No. 17-

171).

        To resolve this case, the court must first consider whether Commerce's determination

that, under § 1677e(a), Hyundai failed to provide requested data is supported by substantial

evidence.  If so, the court must consider whether Commerce met its obligations, under

§ 1677m(d), to notify Hyundai of deficiencies in its submissions.  If Commerce has satisfied its

obligations, the court must next determine whether substantial evidence supports a finding that

Hyundai failed to satisfy the elements of § 1677m(e).  For data which fails to satisfy § 1677m(e),

the court must finally consider whether Commerce drew an adverse influence under § 1677e(b)

based on substantial evidence and in accordance with the law.

        **a.  Commerce established that requested data regarding Hyundai's sales of TWBs, auto parts, and SSBs was missing, such that Commerce had to resort to other facts available.**

        The court must determine whether substantial evidence indicates that Commerce both

made a request and the fact of the missing information.  "The reason for the failure is of no

moment.  The mere failure of a respondent to furnish requested information—for any reason—

requires Commerce to resort to other sources of information to complete the factual record on

which it makes its determination."  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381

(Fed. Cir. 2003).  In Commerce's Final Determination, it found deficiencies with Hyundai's

(1) costs and sales data associated with TWBs and auto parts, and (2) costs data associated with

SSBs.  Final Det. I&D Memo at 7–14, 36–38; Prelim. Det. I&D Memo. at 10–13.

Hyundai argues that Commerce cannot claim the information was missing because it was never properly requested.  Indeed, "unless the requisite information has been fairly requested [by Commerce], it is inappropriate to take recourse to [other facts available]."  <u>Koyo Seiko Co. v. United States</u>, 92 F.3d 1162, 1165 (Fed. Cir. 1996).  <u>Compare</u> <u>Allegheny Ludlum Corp. v. United States</u>, 215 F. Supp. 2d 1322, 1339, 24 C.I.T. 1424, 1442–43 (2000) (finding that, where Commerce requested data related to all "home market sales" and the standards for home market sales were clear, it had not "'hidden the ball' in its initial requests for information . . . "); <u>with</u> <u>Ta Chen Stainless Steel Pipe, Ltd. v. United States</u>, 23 C.I.T. 804, 818–19 (1999) (finding that, where Commerce had failed to "specifically" request information regarding a particular affiliate's US sales, it had failed to provide respondent with sufficient notice).  Hyundai argues that Commerce's instructions presented a "shifting target" as to how Hyundai should have formatted its calculations, and did not account for manufactured products incorporating multiple product control numbers ("CONNUMs").  Pl. Br. at 23, 28, 30.

As § 1677e(a) allows responses to be set aside based on inadequacy of either form or substance, such a deficiency would preclude finding a proper request.  Commerce first requested data on Hyundai's further manufactured products on October 15, 2015, in its "Section E" questionnaire.  Section E Request at 1.  Three supplemental "Section E" questionnaires were subsequently issued on November 19, 2015, December 15, 2015, and February 5, 2016.

Although the standards applicable to Hyundai's further manufactured goods reporting were less settled than the "home market sales" at issue in <u>Allegheny Ludlum</u>, it is likewise clear that in this case Commerce has not "hidden the ball."  <u>See</u> 215 F. Supp. 2d at 1439.  Commerce's October 15 letter requested the following:  (1) sales data for TWBs and auto parts, and (2) "a section E response and a data base for [TWBs and auto parts], as well as for the products which

are coded [SSB] in the section C data base submitted on September 29, 2015." Section E Request at 1. The supplemental request which followed featured twelve questions aimed primarily at clarifying units used, explaining calculation methods, and requesting that certain gaps be filled. Second Supplemental Questionnaire to Sections B&C, and First Supplemental to Further Manufacturing, A-580-878, POI 04/01/2014–03/31/2015, at Attach. 1:1–2 (Dep't Commerce Nov. 19, 2015) ("First Sec. E Supp. Q."). The December 15, 2015, supplemental request generally focused on manufacturing costs, as well as Hyundai's calculations regarding its individual processors and their associated expense ratios. Antidumping Duty Less Than Fair Value Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea, A-580-878, POI 04/01/2014–03/31/2015, at 3–4 (Dep't Commerce Dec. 15, 2015) ("Second Sec. E Supp. Q.").

The final supplemental request sought to clarify Hyundai's breakdown of the components incorporated into each further manufactured product. Hyundai claimed to have implemented the same approach used in Mexican Galvanized Wire, wherein respondent was instructed to adapt Commerce's standard reporting by breaking down the percentage of each subject and non-subject input in a further manufactured product by weight. Hyundai's approach, however, omitted non-subject inputs, a difference for which Commerce sought explanation. See Supplemental Questionnaire to Section E, A-580-878, POI 04/01/2014–03/31/2015, at Attach. 1 (Dep't Commerce Feb. 5, 2016) ("Third Sec. E Supp. Q."); Galvanized Steel Wire from Mexico: Second Supplemental Questionnaire, A-201-840, POI 01/01/2010–12/31/2010, at 6–8 (Int'l Trade Admin. Sept. 16, 2011) ("Mexican Galvanized Wire"). Though it would have certainly simplified the process for Commerce to have directed Hyundai to apply the Mexican Galvanized

<u>Wire</u> approach from the outset, taken together, the foregoing correspondence was sufficiently specific to satisfy Commerce's burden to request the information.

Moreover, Hyundai's exclusion of non-subject inputs in conducting the <u>Mexican Galvanized Wire</u> calculations for its TWBs and auto parts sales skews subsequent calculations by yielding different percentages when determining the make-up of a finished manufactured product, percentages used to calculate adjusted gross price and manufacturing costs. <u>Hyundai Steel's Response to the Department's Supplemental Section E Questionnaire</u>, A-580-878, POI 04/01/2014–03/31/2015, at Attach. 1:1–2 (Feb. 10, 2016) ("Hyundai's Supp. Sec. E Q. Response"). <u>See</u> Def.-Int. Br. at 32–33. This constitutes two violations of § 1677e(a): First, Hyundai omitted data related to non-subject inputs, violating § 1677e(a)(1); and second, Hyundai failed to report data in a form requested by Commerce, violating § 1677e(a)(2)(b). Commerce noted myriad other deficiencies in Hyundai's TWB and auto parts data,[14] but having established the above, it is only necessary to note that Hyundai's December 29 databases did not fill gaps regarding its TWB, auto part, or SSB data.

Hyundai notes that the request which precipitated Hyundai's December 29 response directed it to "provide a new further manufacturing cost database." Second Sec. E Supp. Q. at 4.

---

[14] These included the following: Contrary to Hyundai's narrative responses, the quantity of subject inputs used to produce a further manufactured product did not equal the sales quantity of the subject input. Prelim. Det. I&D Memo at 11. Hyundai twice revised the manufacturing cost of TWBs downward without explanation. Prelim. Det. I&D Memo at 12. When asked for an explanation, <u>see</u> Second Sec. E Supp. Q. at 3, Hyundai magnified the problem by making additional, unrequested changes, <u>see</u> <u>Hyundai Steel's Response to the Department's Supplemental Section E Questionnaire</u>, A-580-878, POI 04/01/2014–03/31/2015 (Dec. 29, 2015) ("Hyundai's Supp. Sec. E Q. Response"); Verification Cancellation Letter at 1–2. Finally, Hyundai's incorporation of processing costs incorrectly reported weighted averages and omitted shearing costs, despite the fact roughly one-third of Hyundai's TWB inputs require shearing. Verification Cancellation Letter at 2; Def. Br. at 26.

This particular request, however, was limited to "changes resulting from the questions above," id.,

and Commerce's Second Supplemental Questionnaire never referred to changes in the costs of SSBs.

Hyundai's Supp. Sec. E Q. Response.  Regarding TWBs and auto parts, Hyundai argues the

databases were timely attempts to reconcile its affiliates' general and administrative ("G&A")

expense ratios, revisions it contends were plainly envisioned by Commerce's questionnaire,

which generally aimed at reconciling individual producers' expenses.  Second Sec. E Supp. Q. at

4; Pl. Br. at 25.  Hyundai went much further than even that interpretation would allow, by, for

example, revising its G&A expense ratio further downward (from 2.35 percent to 1.75 percent),

instead of explaining how its G&A expense ratio was calculated, as requested.  Def. Br. at 29–

30.  Hyundai's non-responsive databases are excludable under § 1677e(a)(2)(b).[15]

Regarding the sufficiency of Hyundai's SSB data, Commerce found that Hyundai's

December 29 submission included significant, unexplained downward adjustments in

manufacturing costs and yield loss.  There were, furthermore, inconsistencies among Hyundai's

narratives, exhibits, and databases.  Verification Cancellation Letter at 1–2.  Both errors fall

under either § 1677e(a)(1) or § 1677e(a)(2)(c).

As Hyundai failed to submit fairly requested information regarding its TWBs, auto parts,

and SSBs, under § 1677e(a) Commerce reasonably identified a gap in the record.

---

[15] As an omission grounded only in § 1677e(a)(2)(b), a full analysis would consider whether Commerce acted in accordance with § 1677m(c)(1), which requires Commerce to "consider the ability" of a respondent who promptly notifies Commerce of its inability to submit information in the requested form and manner, together with a full explanation and suggested alternative forms.  As Commerce has other grounds for omitting Hyundai's TWB, auto part and SSB data, which Hyundai does not claim are remedied by the additional databases, the court need not reach this issue.  Even if this were considered, Commerce's ex parte correspondence with Hyundai over the course of the investigation, indicates that it acted in accordance with the law by considering Hyundai's reporting difficulties, which were in any event repeatedly overstated by Hyundai.

      **b. Commerce timely identified Hyundai's data deficiencies regarding its TWBs and auto parts, and provided an opportunity to respond, but did not timely identify Hyundai's data deficiencies regarding its SSBs.**

The parties frame Hyundai and Commerce's exchange of information quite differently. Commerce characterizes its supplemental "Section E" questionnaires as providing Hyundai an opportunity to correct deficiencies in its initial "Section E" response of November 2, 2015. Commerce thus argues that § 1677m(d) does not require it provide Hyundai with a further opportunity to correct the deficiencies in its supplemental responses. Hyundai, on the other hand, characterizes the supplemental questionnaires as requesting new information, rather than identifying prior errors. It therefore contends the questionnaires are themselves subject to § 1677m(d)'s requirement that a respondent be given an opportunity to correct deficiencies in a response. See Final Det. I&D Memo at 30. Supplemental questionnaires do not, by their nature, necessarily indicate error in a respondent's earlier submission. A questionnaire may, for example, simply reflect the agency's determination that new information would aid in its decision-making. To determine whether Commerce's characterization of the questionnaires is supported by substantial evidence, the court turns to the questionnaires themselves.

Commerce's characterization of the supplemental questionnaires at issue is indeed persuasive. Although portions of Commerce's first supplemental questionnaire could be construed as simply requesting new information, see, e.g., First Sec. E Supp. Q. at Questions 1–3, others are clearly aimed at remedying deficiencies in Hyundai's November 2, 2015, response, see, e.g., id. at Questions 4, 6–8, 10 (identifying inconsistencies and overlap in Hyundai's data, requesting Hyundai comply with Commerce's original reporting instructions to report each component as a separate sale, and further requesting Hyundai specify units for a number of its figures). Commerce's Second Supplemental Questionnaire concerns Hyundai's November 30,

2015, response and again identifies specific deficiencies.  Second Sec. E Supp. Q. at Questions 3–4 (noting the downward adjustment in TWB processing costs and the ambiguity as to which cost buildup related to which processor); Final Det. I&D Memo at 30.  It furthermore requested Hyundai explain its reporting and provide further production expense breakdowns.  Id. at Questions 6–7.  Finally, Commerce's Third Supplemental Questionnaire concerned Hyundai's December 29, 2015, submission, and noted inconsistencies among two of Hyundai's variables, requesting Hyundai to "explain and document why" these variables were different.  Third Sec. E Supp. Q. at Attach. 1.  Commerce's questionnaires thus constitute opportunities for Hyundai to correct data deficiencies under § 1677m(d).

Commerce is obligated to notify Hyundai promptly of the nature of its data deficiencies. 19 U.S.C. § 1677m(d).  Hyundai argues Commerce's five-week delay in responding to its December 29 submission fails to satisfy this standard, considering the limited statutory timeframe for an antidumping investigation.  Pl. Br. at 29–30.  As Hyundai's December 29 submission was itself a correction of earlier deficient submissions, it falls outside the strictures of § 1677m(d).  Commerce's Third Supplemental Questionnaire was aimed at fixing deficiencies in Hyundai's attempts to revise its initial responses.  Furthermore, Hyundai was notified of the particular issue addressed by the Third Questionnaire in Commerce's Preliminary Determination. Compare Prelim. Det. I&D Memo at 11; with Third Sec. E Supp. Q. at Attach. 1.  Commerce's First and Second Supplemental Questionnaires, which are subject to § 1677m(d), followed mere weeks after the submissions to which they referred and were certainly prompt.  Furthermore, these supplemental questionnaires adequately notified Hyundai of the nature of its deficiencies, and requested specific corrections.

Between issuing its Second and Third Supplemental Questionnaire, Commerce in its Preliminary Determination indicated further deficiencies in Hyundai's initial reporting, including unexplained and unsolicited changes to Hyundai's further manufacturing costs, inconsistencies between Hyundai's narrative response and database, and a mathematically incorrect methodology for reporting sales quantity. See Prelim Det. I&D Memo at 11–13. Hyundai never addressed these concerns, but contends it was never given the opportunity to do so. Commerce's Preliminary Determination indicated that: "We intend to provide Hyundai with such an opportunity [to remedy these reporting deficiencies] in the weeks ahead." Id. at 12. Commerce's Preliminary Determination was announced on December 21, 2015, and was followed on December 29, 2015, by Hyundai's Second Supplemental Questionnaire response. Commerce alleges that the quoted phrase from its Preliminary Determination I&D Memo was a reference to Hyundai's then-forthcoming December 29 response, whereas Hyundai argues Commerce effectively promised an additional opportunity to respond which never materialized.

In other circumstances, the court has noted that Commerce "should do its utmost to be fair" in selecting the data it uses. Husteel Co., Ltd. v. United States, 98 F. Supp. 3d 1315, 1345 n.20 (CIT 2015), opinion after remand, 180 F. Supp. 3d 1330, appeal docketed for opinion after remand, No. 17-1013 (Fed. Cir. Oct. 5, 2016). Promising a further opportunity to address deficiencies and failing to provide it does not satisfy this standard. Commerce's Second Supplemental Questionnaire indeed requests additional data regarding Hyundai's further manufacturing costs, see Second Sec. E Supp. Q. at Questions 3–4, 6–7, however it does not mention inconsistencies between Hyundai's narrative response and database, or a mathematically incorrect methodology for reporting sales quantity. The single question on Commerce's Third Supplemental Questionnaire implicates one issue identified in the Preliminary Determination,

but is not the broader "opportunity to remedy its further manufactured sales responses" which Commerce appeared to suggest.  Prelim. Det. I&D Memo at 12; Third Sec. E Supp. Q. at Attach. 1.  Thus, Commerce created an expectation and failed to deliver.

For most of Hyundai's excludable data, this failure does not alter the analysis.  Hyundai was indeed provided an opportunity to remedy some excludable data.  Commerce's Second Supplemental Questionnaire allowed Hyundai to remedy or explain its downward revision of its TWB costs and rectify issues with its average processing costs.  Second Sec. E Supp. Q. at Questions 3–4, 6–7.  Hyundai was likewise afforded the chance to address discrepancies among its quantity variables in Commerce's Third Supplemental Questionnaire.  Third Sec. E Supp. Q. at Attach. 1.  Other excludable data fell outside the scope of any remedial opportunity alluded to by Commerce in its Preliminary Determination.  Most importantly, Hyundai's unsolicited December 29 databases were not presented as a response to Commerce's Preliminary Determination, but rather as a response to an earlier Supplemental Questionnaire.  As an unsolicited portion of a questionnaire response not yet submitted at the time of the Preliminary Determination, these databases could not have been what Commerce had in mind when referencing an opportunity to cure then-existing deficiencies.  Under § 1677m(d), this data was reasonably excluded.

Commerce's failure to provide its promised opportunity to address deficiencies does, however, affect Commerce's recourse to "facts otherwise available" in lieu of Hyundai's SSB data.  As Hyundai has noted, issues with this data were not meaningfully highlighted until Commerce's Verification Cancellation Letter.  See Verification Cancellation Letter at 2; Final Det. I&D Memo at 29–30.  This failure to timely notify is itself a violation of § 1677m(d).  Furthermore, the issues ultimately highlighted included discrepancies between the narratives and

associated exhibits, exactly the sorts of discrepancies referred to in the Preliminary

Determination.   Prelim. Det. I&D Memo at 12.   In the Preliminary Determination, however,

these discrepancies were not specifically linked to Hyundai's SSB data.   Id.   Thus, Commerce

both failed to provide prompt notice of a deficiency and acted unreasonably in promising an

opportunity to remedy this discrepancy, failing to provide such an opportunity, and then holding

the discrepancy against Hyundai.   Further, Commerce's Third Supplemental Questionnaire

precluded Hyundai from submitting "any new or revised sales, cost, or further manufacturing

databases in response."   Third Sec. E Supp. Q. at Attach. 1.   Thus, Hyundai's forbearance in not

affirmatively moving for exceptional treatment after the Preliminary Determination to submit

more information was reasonable.   Accordingly, this matter will be remanded for Commerce to

address Hyundai's SSB cost data, and to recalculate the overall margin as necessary.

> **c.   Hyundai did not submit verifiable information concerning its sales of TWBs and auto parts, and thus Commerce was not required to utilize this information despite its deficiencies.**

Hyundai argues its TWB and auto part data satisfies the five-part test under § 1677m(e)

and should nonetheless be included, even if it did not satisfy Commerce's reporting

requirements.   The extra databases included in Hyundai's December 29 report did not, as

discussed above, fairly fall within the confines of Commerce's Second Supplemental

Questionnaire.   Thus, those databases do not satisfy the timeliness prong of § 1677m(e).

Hyundai's repeated downward revisions of its TWB costs, the issues associated with its

TWB and auto part processing costs, and the discrepancies in its quantity variables will be

assessed together as follows.   The parties strongly disagree as to whether this data was

"verifiable" within the meaning of § 1677m(i).   If so, this data satisfies one prong of § 1677m(e),

and the remaining prongs must be assessed.   Verification is typically regarded as a "spot check"

of a respondent's submissions.  See Micron Tech., Inc. v. United States, 117 F.3d 1386, 1396

(Fed. Cir. 1997).  Despite Hyundai's contention to the contrary, Commerce need not accept

information it declines to verify "on its face."  Under § 1677m(i), Commerce is obligated only to

verify information it uses in making a final determination.  Naturally, the ability to be verified is

a prerequisite.  See JTEKT Corp. v. United States, 675 F. Supp. 2d 1206, 1252, 33 C.I.T. 1797,

1849–50 (2009).

Hyundai argues that, because Commerce had already verified other data at the facility

containing Hyundai's further manufactured goods data, that it was both possible and feasible for

Commerce to verify both.  Pl. Br. at 33.  Commerce and defendant-intervenors contend that

Hyundai's further manufactured goods data was so fundamentally flawed that it was

unverifiable.  Def. Br. at 39; see generally Verification Cancellation Letter.  Hyundai responds

that if Commerce found the data "unverifiable," it would have been easy enough to submit it to

verification to test this hypothesis.  Pl. Br. at 33.  This pithy argument, however, ignores the fact

that Commerce's cited grounds for unverifiability included "inconsistencies, and . . . multiple

unexplained, or insufficiently explained, changes" in Hyundai's data.  Verification Cancellation

Letter at 1.  Commerce again cited these errors in more depth in its Final Determination Memo.

Final Det. I&D Memo at 29–30.  As Section II(a) of this opinion indicated, these findings are

supported by substantial evidence.  See JTEKT Corp., 675 F. Supp. 2d at 1252.  Such

deficiencies are not fairly testable, as the crux of the deficiency is that Commerce, upon

reviewing the submissions in question, cannot discern which data is meant to be tested.  Thus,

the remaining data at issue does not satisfy the verifiability prong of § 1677m(e).  Commerce

was not required to consider Hyundai's TWB or auto part data under § 1677m(e), and thus its

recourse to other facts available regarding this data was reasonable.

**d. Commerce's application of an adverse inference when calculating Hyundai's antidumping margin was reasonable with regards to Hyundai's TWB and auto part data.**

Commerce is authorized to "use an inference that is adverse to the interests of [a] party in selecting from among the facts otherwise available" where that party has failed to cooperate to the best of its ability.  19 U.S.C. § 1677e(b)(1).  <u>See</u> SAA at 870.  An adverse inference is thus predicated upon an information request directed to an interested party and that party's failure to cooperate to the best of its ability.  The existence of a request for information from Commerce was established as discussed, <u>supra</u>.  The remaining issue is whether Hyundai cooperated with these requests to the best of its ability.

A respondent satisfies the "best of its ability" standard when it "put[s] forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." <u>See</u> <u>Nippon Steel</u>, 337 F.3d at 1382.  The Federal Circuit noted this standard does not demand perfection, but does not condone "inattentiveness, carelessness, or inadequate record keeping." <u>Id.</u>  Instead, the statutory framework "requires the respondent to do the maximum it is able to do."  <u>Id.</u>  A respondent's attempts to avoid supplying requested information generally preclude a "best of its ability" finding.  <u>See</u> <u>Qingdao Taifa Grp. Co., Ltd. v. U.S.</u>, 637 F.Supp.2d 1231, 1239–40, 33 CIT 1090, 1096–97 (2009).

"The purpose of the adverse facts statute is 'to provide respondents with an incentive to cooperate' with Commerce's investigation, not to impose punitive damages."  <u>Essar Steel Ltd. v. United States</u>, 678 F.3d 1268, 1276 (Fed. Cir. 2012) (quoting <u>F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States</u>, 216 F.3d 1027, 1032 (Fed. Cir. 2000).).  Accordingly, "[i]n employing adverse inferences, one factor the agencies will consider is the extent to which a party may benefit from its own lack of cooperation."  SAA at 870.

Hyundai emphasizes that it submitted fifteen responses, participated in three separate verifications wherein only minor issues were found, and repeatedly sought guidance from Commerce regarding its reporting difficulties.  Pl. Br. at 20–22.  Furthermore, Hyundai notes, it made every effort to devise allocation methods to account for the subject CORE portion of the final product prices, despite the fact that certain aspects of its production process were not represented easily in Commerce's standard questionnaire.  Pl. Br. at 23–24.  Hyundai alleges Commerce has "rarely, if ever, attempted to account for" such a complex further manufacturing process in its dumping margin calculations.  Id. at 23.

In response, Commerce notes that despite multiple attempts, Hyundai's repeatedly unusable or deficient responses indicate inattentiveness.   Final Det. I&D Memo at 38. Commerce further notes that Hyundai later rescinded many of its claimed reporting difficulties, and underestimated the percentage of its sales affected by faulty submissions.  Def. Br. at 36–37. Whereas Hyundai claimed only one percent of sales were affected, Commerce later discovered that ten percent of sales were affected.  See Final Det. I&D Memo at 38.  Commerce further argues that it attempted to accommodate Hyundai by offering filing extensions, agreeing to ex parte meetings when requested, and providing multiple chances for Hyundai to remedy its filing deficiencies.  Final Det. I&D Memo at 13–15, 29–30.  There is, however, no indication, other than unsubstantiated allegations that Hyundai engaged in "delay tactics," Def.-Int. Br. at 38, that Hyundai deliberately concealed or withheld information, so that a broader use of AFA might be applicable.

Commerce did not act arbitrarily or contrary to law in determining to apply an adverse inference in applying "facts otherwise available," restricted to Hyundai's further manufactured sales of TWBs and auto parts.  Although Hyundai appears to have been diligent in many ways, it

did not act to the "best of its ability" in complying with Commerce's requests for TWB and auto

parts data.   Minor delays and inaccuracies may be excusable where a respondent's complex

supply chain is difficult to translate into Commerce's standard forms.   Nevertheless, "[i]n

preparing a response to an inquiry from Commerce, it is presumed that respondents are familiar

with their own records."   Nippon Steel, 337 F.3d at 1383.   The most significant shortcomings in

Hyundai's performance are its repeated retractions of claimed reporting difficulties and its

inaccurate estimation of how many sales were affected by its reporting errors.   These suggest, at

minimum, the sort of inattentiveness Nippon Steel held not to satisfy the "best of its ability"

standard.

### CONCLUSION

For the foregoing reasons, Hyundai's motion for judgment on the agency record is

**GRANTED**, in part, and **DENIED**, in part.   This matter is **REMANDED** for Commerce to

provide Hyundai the opportunity to remedy data deficiencies as to SSBs, and to recalculate

Hyundai's antidumping margin as appropriate.

/S/ Jane A. Restani
Jane A. Restani
Judge

Dated:  January 10, 2018
         New York, New York